## BURTON v. ASBESTOS LIMITED, Inc.
### Civ. A. No. 7206.

United States District Court
D. New Jersey.
July 15, 1950.

Morris Spritzer, New Brunswick, N. J., Baruch Seidman, South River, N. J., of counsel, for plaintiff.

Milton, McNulty & Augelli, Jersey City, N. J., Anthony T. Augelli, Jersey City, N. J., and Francis A. Mahony, New York City, of counsel, for defendant.

FORMAN, Judge.

The lengthy history of the litigation prior to the present trial is recited in an opinion filed herein.[1] To review it briefly: Quigley Company, Inc., of New York, sued Asbestos Limited, Inc., also of New York, in the former Court of Chancery of New Jersey for specific performance of its contract with the latter dated January 29, 1942,[2]

1. Filed July 3, 1947 (unreported).

2. "January 29, 1942
"Memorandum of Agreement
"Between Asbestos Limited Inc., a New York corporation hereinafter called Asbestos Inc. and Quigley Company Inc., a New York corporation hereinafter called Quigley Co., Witnesseth:
"Whereas, Asbestos Inc., represents that it developed for the market and owns the patent and trade rights in an expanded asbestos insulating material newly put out by it under the trade name 'New Era Insulation', having high strength and refractory properties and light weight, and favorably reported by Massachusetts Institute of Technology in a letter of April 4, 1941, after testing in comparison with the widely used so-called '85 percent Magnesia' material;
"And Whereas, Quigley Co. has extensive trade channels and connections for the manufacturing, distributing and marketing of insulating materials in the refractory or high temperature field, and both parties desire an arrangement between them whereby Quigley Co. will distribute and market throughout the United States and Canada the said New Era materials and products made therefrom;
"Now Therefore, in consideration of the respective agreements of the parties they hereby agree and covenant as follows:
"1. Asbestos Inc. hereby grants and extends to Quigley Co. the exclusive rights and franchise, for the refractory field and industries, in the distribution, marketing and sale of said New Era materials and products; this term being intended to cover all expanded asbestos materials under whatever name made and sold and whether or not covered by patents or applications; the granted rights to be exclusive for the United States and Canada; except that should negotiations now under way result in a contract between Asbestos, Inc. and Gladding, McBean & Co. for non-exclusive rights in states west of the Rocky Mountains, Quigley Co. shall not be restricted from selling New Era materials and products in such territory.
"2. In reinforcement of such exclusive rights Asbestos Inc. hereby covenants (a) that it will not compete with Quigley Co. nor aid competition in the refractory field; and (b) that it will not sell New Era materials or products to any manufacturers, distributors or dealers in the refractory field other than Quigley Co.; and (c) that it will not license or give consent to any person or concern to manufacture or sell New Era materials or products in the refractory field; and (d) that it will not license or give consent to any person or concern to manufacture or sell New Era materials or products in other than the refractory field without first giving Quigley Co. an option to provide mutually satisfactory manufacturing or selling facilities therefor. And Asbestos Inc. further agrees that as to any metropolitan area or state wherein Quigley Co. has established or may establish a branch office or distributor, then upon request Asbestos Inc. will engage Quigley Co. exclusively to act as sales agent therein for all fields other than refractory fields.
"3. Asbestos Inc. hereby further agrees that it will fill all Quigley Co. orders as promptly as possible and with

alleging substantially that its exclusive rights and franchise to market the product of Asbestos had been breached. After a trial the court refused to grant specific performance, but without prejudice to the institution of an action which the court stated could be maintained for the recovery of damages for the alleged breach of contract by Asbestos.[3] Notwithstanding its success in resisting specific performance Asbestos appealed that decision to the then New Jersey Court of Errors and Appeals complaining that when the Court of Chancery of New Jersey declined to grant the relief of specific performance it exhausted its capacity for remedy and had no jurisdiction to decree the subsisting validity of the contract. The then highest court of New Jersey affirmed the decree of the Court of Chancery in a per curiam opinion.[4]

Thereupon Quigley assigned its rights to George L. Burton, the present plaintiff, who started a suit at law against Asbestos in the former New Jersey Supreme Court, which it removed to this court and filed an answer here. Plaintiff moved to strike paragraphs 4 and 5 of the answer and ten separate defenses contained in it and an amendment thereto, and the motion was granted in an opinion to which reference was first made herein, on the theory that the defenses set up by Asbestos in this suit were pressed in the Court of Chancery, negatived by it in its ruling and affirmed by the Court of Errors and Appeals, making a similar ruling binding upon this court by virtue of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487.

An appeal was taken by Asbestos to the United States Court of Appeals for the Third Circuit,[5] but it was dismissed on motion of the appellee with the consent of the appellant.

Thereupon the case was tried to this court without a jury. At the trial defendant moved to strike the complaint on the ground that plaintiff failed to establish the allegations thereof, upon which motion ruling was reserved along with decision on the case. Much testimony was heard and numerous documents were offered in evidence.

The evidence disclosed that prior to January 1942 Mr. John A. Mulcahy, Secretary and Treasurer of Quigley, met with Mr.

---

highest quality of goods; and that its sales to Quigley Co. shall be at list prices not higher than prevailing list prices of 85 percent magnesia; and that such sales shall be with a discount of not less than sixty percent (60%) nor less than prevailing discounts, with the intention to increase the discount to sixty-five percent (65%) or seventy percent (70%) if and when increase of production and sales may warrant; and agrees further that the terms of sale to Quigley Co. shall be two percent (2%) within ten (10) days, net within thirty (30) days.

"4. In consideration of the above agreements and their full performance Quigley Co. hereby agrees, during the continuance of this agreement, (a) that it will use its best reasonable efforts to push and increase sales of New Era materials hereunder in the refractory field; (b) that it will discontinue selling in such field its own 'Insultlox' product in competition with the New Era goods but this is not to apply to bricks or slabs; (c) that it will refrain from taking on and selling in such field any asbestos-containing competing goods.

"5. This agreement shall run until and unless terminated as follows: (a) either party may terminate upon a serious default of the other not made good within thirty (30) days of written notice; (b) Quigley Co. may terminate at its option on thirty (30) days written notice if by reason of lack of patent enforcement serious competition in similar goods arises or if for other reason the enterprise becomes unprofitable.

"Executed at New York City, January 29, 1942

"Asbestos Limited Inc.
By /s/ N. E. Newman
"President

"Attest:
"/s/ George H. Rhinehart
"V. Pres.

"Quigley Company, Inc.
By /s/ D. F. McMahon
"Vice-President

"Attest:
"/s/ J. A. Mulcahy
"Secretary"

3. Quigley Co., Inc., v. Asbestos Ltd., Inc., 44 A.2d 89, 23 N.J.Misc. 301.

4. Quigley Co., Inc., v. Asbestos Ltd., Inc., 138 N.J.Eq. 111, 46 A.2d 787.

5. No opinion for publication.

George H. Rhinehart, then a vice president of a banking house having the accounts of both Quigley and Asbestos. Mr. Rhinehart confided to Mr. Mulcahy that he knew that Asbestos was about to market its new invention extensively, an expanded asbestos under the name of New Era Block Insulation, and that it was superior competitively to 85% magnesia, then the presumably standard material in the field. In fact Mr. Rhinehart shortly thereafter left the banking field to become a vice president of Asbestos. Following tests which proved the material to be highly satisfactory, negotiations were conducted by Messrs. Mulcahy and Rhinehart in which the abilities of Quigley to act as the sales representative of Asbestos were explored. It appeared that Quigley had broad contacts in the field in which this material would be used and kindred fields and was in position to devote its force of distributors and sales people to the exploitation of the sale of the product, even to the extent of limiting itself from selling its own or other products which might be in competition with it. Asbestos, on the other hand, was in production in a small way, and, expecting to be to a much larger extent in the comparatively near future, welcomed the idea of obtaining the use of the ready made sales organization of Quigley rather than spend the time and money in building one of its own. The above mentioned officers and the presidents of both principals finally reached an understanding which resulted in the contract in this case. Quigley signed on January 29, 1942 and Asbestos executed it on February 13, 1942. Quigley immediately organized its sales force and began to sell the product at resale prices in accordance with the agreement.

It also appears from the evidence that certain shares of stock in Quigley were presented to Mr. Rhinehart and to Mr. Newman, the president of Asbestos. No serious attempt at recovery of these shares was put forth in this litigation.

Until September of 1942 relations between the contracting parties were apparently fairly amicable. Some time around the latter period, however, it appears that Quigley felt that the time contemplated by the contract when it would receive a discount of 65% or even 70% instead of the initial rate of 60% had arrived. It was contended by plaintiff's witnesses that this was expected when the plant to be built by the Navy would get into production. As a matter of fact, it appeared that the Navy plant was completed in October of 1942 and took several months to get into production. However, Quigley hastened, in September, to deduct 65% from the bills of Asbestos notwithstanding that they were made out at the rate of 60%. In the light of the price structure which was fixed at 30 cents a board foot subject to discounts according to classifications as appeared from Exhibit P-4[6] and which coincided with prices and discounts as fixed in the 85% magnesia industry (P-5), it would appear that, in many instances, Quigley would be selling for precisely the same discount of 60% for which it would be buying, and it could only be supposed that it engaged in this relatively unlucrative enterprise with the notion that better days were to come. For some time as fast as Quigley deducted 65% Asbestos would rebill at 60%. Finally in October of 1942 there was a considerable sum due Asbestos according to its calculations.

Following a determined effort to collect upon the part of Asbestos, Quigley re-

6.

"Delivered Price on New Era Insulation
Zone –1– East Mississippi River
Discounts to All Classes of Trade

| | A–Approved Distributor | B–Equipment C–Industrial Contractors | C–Listing Plbg. & Supply D–Other Companies | R–Railroads | U–U.S. Govt. | X–Approved Industrialists | Z–All Others |
|---|---|---|---|---|---|---|---|
| Carload | 60% | 54 | 54 | 54. | 52 | 54 | 50 |
| Less Carload | 58% | 50 | 50 | 50 | 50 | 50 | 45" |

treated and the amount due was adjusted at the discount rate of 60%. However, Quigley insists that it demanded that thereafter the rate should be 65% and that Asbestos agreed, but this was denied by Asbestos. Then followed a period where a discount of 60% and 5% was allowed to Quigley. Quigley says it was a sort of stopgap designed for a brief interim until the full 65% should be allowed. Asbestos says it was a special allowance to cover only certain specified cases when Asbestos was willing to make an additional allowance due to specific losses Quigley was taking in these transactions. In any event bills subsequently went out from Asbestos at 60% and in practically no case was 65% actually allowed by Asbestos to Quigley. All of this, together with a tendency upon the part of Quigley to slow down its remittances, provide motivation for a considerable volume of mutual verbal and written complaint, and finally late in 1943 Asbestos sought to cancel the contract but Quigley remained firm against permitting it to do so.

In consequence of the success of the motion to strike what amounted to the backbone of the answer of Asbestos it was left with but two attacks upon the contract per se. The first is that the contract with Quigley is invalid for it failed to specify a term for which it is to run. It is true that no definitive provision is made therein in this respect. The question was also raised before Vice Chancellor Fielder in the Chancery case, concerning which he said: "Complainant contends that although the contract fixes no term for which it shall run, the presumption is that the term intended is for the life of the defendant's patents. The evidence does not disclose what that term is but it may be quite long because the contract states that defendant owns patents and patent rights for material it has 'newly put out' and the inference is that the patent rights had been acquired but a short time prior to the contract date and therefore still have a long period to run." Quigley Co., Inc. v. Asbestos, Ltd., Inc., 44 A.2d at page 92, 23 N.J.Misc. at page 305, Asbestos continued to deal with Quigley until October of 1943 and continued to manufacture and sell the product which was the subject of the contract until 1945. Plaintiff has framed its demand for damages within that period and the term of the contract as characterized by the Court of Chancery is definite enough to sustain plaintiff's claim.

The other attack upon the contract, which Asbestos pressed with vigor, was that when it undertook to sell the product contemplated by the contract to others than Quigley it did not violate its terms. Paragraph 2 of the contract provided as follows: "In reinforcement of such exclusive rights Asbestos Inc. hereby covenants (a) that it will not compete with Quigley Co. nor aid competition in the refractory field; and (b) that it will not sell New Era materials or products to any manufacturers, distributors or dealers in the refractory field other than Quigley Co.; and (c) that it will not license or give consent to any person or concern to manufacture or sell New Era materials or products in the refractory fields; and (d) that it will not license or give consent to any person or concern to manufacture or sell New Era materials or products in other than the refractory field without first giving Quigley Co. an option to provide mutually satisfactory manufacturing or selling facilities therefor. And Asbestos Inc. further agrees that as to any metropolitan area or state wherein Quigley Co. has established or may establish a branch office or distributor, then upon request Asbestos Inc. will engage Quigley Co. exclusively to act as sales agent therein for all fields other than refractory fields." Asbestos contended that in every instance it sold the product to a vendee not in the refractory field or industry and hence it had committed no violation of its contract.

The meaning of "refractory" in the sense that it was used by the parties to the contract becomes of vital importance. Asbestos urged that it gave Quigley nothing more than an agency to sell its material in that area of the industry which dealt with materials used to resist the higher temperatures in excess of 1600 degrees. While it agreed that its material could not be exposed to direct heat in excess of that temperature it contended

that its grant contemplated the use of the material as insulation in a so called "pack up course" in connection with other more highly heat-resisting materials. It pointed out that the geographical scope of the contract covering the United States and Canada in itself made it unlikely that it would have given Quigley an exclusive franchise for so vast a territory had it not intended to restrict it to only the high-heat trade in which Quigley itself had important contacts. Quigley, on the other hand, pressed that Asbestos was bargaining for its large sales organization and that it was unlikely to have been interested in an assignment which would have given it an exclusive access to only the higher heat trade which constituted but 2 percent of the field of possible users of the material.

Asbestos urged that its construction of "refractory" was not different from that of Vice Chancellor Fielder when he interpreted it to mean "in which the defendant's products could be used successfully" but contended that the words "for refractory purposes" must be added so that the sense would be a field "in which the defendant's products could be used successfully for refractory purposes".

The broader interpretation given to "refractory" by Vice Chancellor Fielder, not limited as claimed by Asbestos, appears controlling both from the standpoint of law and logic. From a legal point of view it was made the subject matter of controversy by the same parties before him and was determined by him, Quigley Co. v. Asbestos Limited, 44 A.2d 89, 91, 23 N.J.Misc. 301, and that determination was affirmed by the opinion of the highest court of New Jersey, 138 N.J.Eq. 111, 46 A.2d 787.

The New Jersey law holds that a prior judgment between the same parties or their privies is conclusive as to such matters actually litigated and necessarily determined as questions of law. McAlpine v. Garfield, 137 N.J.L. 197, 199, 59 A.2d 3. The same parties or their privies are before this court as were before the Court of Chancery. Having litigated the construction to be placed upon the term "refractory" Asbestos is now bound by the state court decision. Cf. Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832.

Logically, too, it appears that the parties contemplated no narrow area circumscribed as Asbestos would now have it but a broad one in the insulation industry generally that would give breadth of play to the facilities of Quigley as the selling agency for Asbestos in this line in the United States and Canada (with some modification west of the Rocky Mountains, as clearly set forth in the contract).

The testimony disclosed that the negotiations of Messrs. Mulcahy and Rhinehart, like the terms of the contract itself, were loose and diffused, but the conclusion is inescapable that the parties looked forward to fusing the production element of Asbestos with the distribution facilities of Quigley, even though for the period of the war ultimate growth of their relationship might remain stunted. Illumination upon the state of this relationship is revealed in the colored advertising circular (Exhibit P-17) prepared by Quigley and approved for distribution by Asbestos. In it the product is described as follows:

"Lightweight Insulblox and Pipe Covering represents a remarkable new development in the field of lightweight, high temperature refractory insulation. This superior product is the lightest asbestos insulation made for high or low temperatures and combines high thermal efficiency with excellent mechanical strength and the ability to withstand vibration, impact and shock.

"Lightweight Insulblox and Pipe Covering are comparable in appearance to 85% Magnesia insulation, but offer lighter weight, being made of asbestos, and have approximately 20% lower thermal conductivity. They are recommended to withstand temperatures of 1600° F. and are suitable for all intermediate temperatures.

"Lightweight Insulblox and Pipe Covering are the result of an exclusive new process, which expands asbestos fibres under extreme pressure—creating minute, confined air cells.

"This lighter, stronger, more efficient insulation meets the urgent demands of the

day for superior performance, longer service, economy and increased production.

### Advantages of Quigley Lightweight Insulblox

"1. Extraordinary Lightness: Lightweight Insulblox are the lightest weight high temperature insulation blocks ever manufactured. They weigh approximately 1.1 pounds per square foot per inch thick and are made of asbestos by a new process.

\*　\*　\*　\*　\*　\*

"4. Temperature: Lightweight Insulblox are recommended to withstand temperatures up to 1600° F. Being equally suitable for high or *low* temperatures, they save the time and eliminate the inconvenience (not to mention the expense) involved when low and high temperature insulations must be used in combination.

\*　\*　\*　\*　\*　\*

"7. All Purpose Insulation: Lightweight Insulblox are equally suited for insulating boilers, tanks and other *low* temperature installations as they are for furnaces and other types of equipment where temperatures range up to 1600° F." (Italics supplied.)

If Quigley was not to solicit the general trade in insulation why did Asbestos approve such a type of representation by Quigley?

The conclusion appears inevitable that the word "refraction" did not limit Quigley to only the high temperature trade but that in effect it was granted what amounts to an exclusive distribution franchise for the territory specified in the contract. It follows that when Asbestos sold directly to the trade it cannot fall back upon the defense that it was privileged to do so since it was only precluded from competing with Quigley in that area where the business was with firms dealing only in high temperature (over 1600 degrees) refractories. Therefore it further follows that Asbestos became liable to Quigley in damages for breach of contract when it made direct sales to those to whom it had authorized Quigley to sell under their contract.

The first question that now confronts us is whether Quigley became entitled to 65% or 70% discount instead of 60%? The contract itself provided that it was the intention of the parties to "increase the discount to sixty-five percent (65%) or seventy percent (70%) if and when increase of production and sales may warrant". It became the burden of the plaintiff to show that the increase in production and sales warranted the additional discounts. No evidence was advanced to indicate that 70% was under consideration by the parties at all. As to the 65% discount the evidence made it clear that Quigley regarded itself as entitled to a discount of 65% but that this was quite unilateral and Asbestos never acquiesced. For a period Asbestos permitted Quigley to deduct 60% and 5%, but this was followed by later refusals to countenance more than a 60% discount. The plaintiff has not sustained the burden of showing that the increase in discount was warranted or that there was tacit or other consent by Asbestos to such a deduction. We may therefore consider that the only discount to which Quigley became entitled in this action was at the rate of 60%.

Our next inquiry then must be directed to the amount of damage that Quigley suffered by reason of Asbestos selling to customers in its (Quigley's) domain.

It is conceded that the sales of Asbestos fell into three classifications. First, the material was sold to the Navy. Secondly, it was sold to parties holding priorities under the wartime regulations covering the sale of critical goods and, lastly, to regular purchasers.

The plaintiff's claim to have been damaged by any sales made by Asbestos to the Navy is not sustained. It is amply demonstrated that Quigley knew seasonably before the execution of the contract that the Navy was building a plant for Asbestos to manufacture primarily for it. In fact, it appears from the evidence herein and as was found in the case in the state court, 44 A.2d at page 89, 23 N.J.Misc. at pp. 302-303, that the contract was executed between Asbestos and the Navy on February 5, 1942, some days before it signed its contract with Quigley. Under it the Navy was given first option on all of its materials with the

provision as follows: "The right of the Contractor to use the Facilities shall include the right to use them in the performance of work other than Government work; Provided, however, that the Contractor shall at all times, give such priority to Government work as the Department shall from time to time require."

Under these circumstances there was no reason for Asbestos to pay tribute to Quigley on the orders it received from the Navy.

The priority orders stand in a somewhat different footing. The defendant contended that the national emergency declared by the President of the United States in his proclamation of September 8, 1939, followed by our entry into active hostilities on December 7, 1941, created a situation which prevented it from dealing freely with its products as would have been the case under normal conditions. It asserted the series of acts, commencing with that of June 28, 1940, 54 Stat. 675, c. 440, amended by the Act of May 31, 1941, 55 Stat. 236, c. 157, and the Act of March 27, 1942, 56 Stat. 177, c. 199, Title III, 50 U.S.C.A.Appendix, § 1152, providing for Presidential authority to establish a system of priority regulations governing materials necessary for the national defense altered private contractual relationships. Pursuant to these acts, Executive orders and Regulations of the War Production Board were promulgated which controlled the disposition of asbestos products. Compliance with the paramount authority of the government in preference to existing private contracts, the defendant urged, exculpated it from any breach of contract. It further argued that no distinction existed between orders submitted by the United States Navy and priority sales to private concerns, since priority regulations required the defendant to honor such orders regardless of any commitment to the plaintiff.

The plaintiff, however, argued, that the system of priorities did not alter the basic relationships between producer, dealer, distributor and jobber, and that the fundamental concern of the government during the recent war was to preclude the diversion of critical materials to ultimate consumption not essential to the war effort. Commercial activities which were merely steps or stages in bringing such essential materials from the original producer to an essential fabricator were not violative of or inconsistent with the government's aims, since in many cases, the traditional distributive channels served to expedite movement of such materials. It alleged that distributors were not intended to be put out of business by government control and argued that exclusive sales contracts such as existed between it and the defendant were not basically altered by the priority system and that there was no conflict between faithful performance of the contract in question and government controls. It further pointed out that the testimony showed the defendant to have sold almost half of its products to "regular" or non-priority sales during the controlled period while at the same time contending that it, the defendant, was unable to supply the plaintiff's assignor. It insisted the only effect of the priority regulations was to require that a purchaser present the applicable certification.

The plaintiff attempted to buttress its argument by reference to a departmental interpretation of Section 944.2 of the Regulations of the War Production Board, which was in effect as follows: "However, if a manufacturer or wholesaler has an exclusive distributor, either for all sales or for a particular territory, he may reject orders from other purchasers provided the exclusive distributor is in a position to fill the orders promptly. (Int. 3, June 30, 1943, 8 P.R. 8994)." 32 CFR, 1943 Supp. § 944.2, p. 1423.

Quigley kept no appreciable inventory on hand. It submitted its orders to Asbestos to be filled and shipped in nearly all cases directly to the customer. There apparently was no difficulty in filling the requirements of the Navy and the orders with priority certificates, and some material was left for the filling of regular orders. The last mentioned interpretation has reference to a situation unlike the one in question here, but the objections of Asbestos are likewise not in point, since Quigley was the exclusive distributor for Asbestos and since there was no inability to fill rated orders both by Quigley and Asbestos, Quigley was

entitled to whatever profits it could have made upon the rated orders received by Asbestos in the same manner as upon regular orders. To the extent that it was not permitted to take such profit it was damaged by the fulfillment by Asbestos of the priority rated orders. Therefore the plaintiff is entitled to recover damages where Asbestos sold to regular customers or on priority rating at prices which were susceptible of a profit being made by Quigley having in mind that it was restricted to a discount of 60%.

The proportion of sales made by Asbestos to the Navy, under priority ratings and regular orders for the period during which the material was produced was as follows:

| To the Navy | By Priority Rating | By Regular Order |
| --- | --- | --- |
| $194,496.30 | $575,511.53 | $160,625.33 |

Quigley itself sold the product under priority ratings to the extent of $17,385.36 and to regular customers in the aggregate of $61,473.74.

■ In an effort to compile these damages plaintiff has submitted a calculation covering each sale made by Asbestos and, if he suffered damages thereby, the amount thereof. For example, Asbestos is shown to have sold Asbestos Covering and Roofing Company on June 10, 1942, 3600 feet of material an inch thick at list price of thirty cents with a discount of 60%. It was a Class A account and was granted a discount of 60%. Under the re-sale price schedule established by agreement between Quigley and Asbestos its discount should have been 58% assuming the purchase involved less than a carload lot, as it appears to have done. In his computation of damage plaintiff calculates that Quigley could have had a 2% profit on this transaction (purchased at 60% and selling at 58%) amounting to $21.60. This is a proper calculation of the damage Quigley suffered on this transaction and should act as the yardstick of damage on the other transactions.

In plaintiff's calculations, however, he applied a discount of 60% from the period beginning in February, 1942, and ending in September, 1942. Thereafter he made his calculations at 65% and 70% discounts. Since these have been ruled out of the case they are irrelevant in arriving at the aggregate amount of damage recoverable by the plaintiff. It will be necessary to recalculate each transaction for the purpose of ascertaining the damage for which he can recover on the basis of the 60% discount only. This will entail a very considerable amount of computation.

■ Plaintiff has also pressed for an allowance of interest against defendant from the time of the breach of the contract upon each item of damage. He has cited authorities to the effect that interest is allowable upon claims of such a nature and that the amount is capable of ascertainment by mere computation or can be established with reasonable certainty or determined by reference to well established market values. Plaintiff's claim in this case is not governed by the above well established principle. Serious and substantial controversy existed as to the amounts due. They were not susceptible of ascertainment until a number of legal questions were adjudicated. As was said in Horst Co. v. Peter Breidt City Brewery, 94 N.J.L. 230, at page 235, 109 A. 727, 729: " * * * interest is not allowed on an unliquidated damage that is not capable of ascertainment by mere computation, for the reason that the person liable does not know what sum he owes; he cannot compute the interest and therefore he is not in default for not paying (22 Cyc. 1512; 8 R.C.L. par. 533 [§ 85]), not on uncertain and unascertained damages. (Speer v. Van Orden, 3 N.J.L. 652; Philbrick v. Mundy, 93 N.J.L. 43, 106 A. 361)." Under these circumstances interest is not allowable in this case except to run from the entry of judgment.

For the purpose of arriving at the amount of the judgment to be entered in favor of the plaintiff the parties (without conceding the correctness of this opinion to the prejudice of their rights of appeal) should agree upon an aggregate sum as disclosed by the transactions. Failing such agreement an order will be made referring to a master

the calculation of such amount. Notice of the settlement of an order denying the motion of defendant to dismiss the complaint and for entry of judgment in favor of plaintiff pursuant to the terms of this opinion should be given.

